UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Filed with Classified
Information Security Officer
CISO [signature]
Date 8/1/11

| | |
|---|---|
| **FADHEL HUSSEIN SALEH HENTIF, et al.,** Petitioners, v. **BARACK H. OBAMA, et al,** Respondents. | **Civil Action No. 06-1766 (HHK)** |

## MEMORANDUM OPINION

Fadhel Hussein Saleh Hentif (ISN 259), a Yemeni citizen, was seized by Pakistani authorities in late 2001 and has been held by the United States at the naval base detention facility in Guantanamo Bay, Cuba since early 2002. Hentif has filed a petition for a writ of habeas corpus contending that he is unlawfully detained. Respondents in this case, President Barack H. Obama and other high-level officials in the United States Government, argue that Hentif is lawfully held and therefore should remain in U.S. custody. The parties filed cross-motions for judgment on the record and appeared before the Court for a four-day hearing on the merits of Hentif's petition. Upon consideration of the motions and the evidence presented at the merits hearing, the Court concludes that respondents have demonstrated that Hentif's detention is lawful. Therefore, Hentif's petition shall be denied.

## I. LEGAL STANDARDS

### A. Scope of the Government's Detention Authority

The Authorization for Use of Military Force ("AUMF"), Pub. L. No. 107-40, 115 Stat. 224 (2001), authorizes the President to "use all necessary and appropriate force against those

~~SECRET~~

UNCLASSIFIED//FOR PUBLIC RELEASE

nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations, or persons." Pub. L. 107-40, § 2(a), 115 Stat. at 224. The U.S. Supreme Court has held that the U.S. District Court for the District of Columbia has jurisdiction over petitions for writs of habeas corpus brought by detainees held at Guantanamo Bay pursuant to the AUMF. *See Boumediene v. Bush*, 553 U.S. 723, 792 (2008); *Rasul v. Bush*, 542 U.S. 466, 483–84 (2004). The Supreme Court has provided "scant guidance," however, as to whom respondents may lawfully detain under the statute. *Al-Bihani v. Obama*, 590 F.3d 866, 870 (D.C. Cir. 2010) (noting that the Supreme Court has "consciously le[ft] the contours of the substantive and procedural law of detention open for lower courts to shape in a common law fashion" (citing *Hamdi v. Rumsfeld*, 542 U.S. 507, 522 n.1 (2004) (plurality opinion); *Boumediene*, 553 U.S. at 796)).

Although the D.C. Circuit "has yet to delineate the precise contours" of the proper legal standard by which to evaluate the lawfulness of the detention of the individuals held at Guantanamo Bay, *Barhoumi v. Obama*, 609 F.3d 416, 424 (D.C. Cir. 2010), it has held that any individual who is "part of" Al Qaeda or the Taliban may be detained pursuant to the AUMF. *Al-Adahi v. Obama*, 613 F.3d 1102, 1103 (D.C. Cir. 2010); *see also Bensayah v. Obama*, 610 F.3d 718, 725 (D.C. Cir. 2010); *Awad v. Obama*, 608 F.3d 1, 11 (D.C. Cir. 2010). The determination of whether an individual is "part of" Al Qaeda "must be made on a case-by-case basis by using a functional rather than formal approach and by focusing upon the actions of the individual in relation to the organization." *Bensayah*, 610 F.3d at 725. Accordingly, in this case, the Court

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

will assess whether respondents have shown that Hentif is functionally part of Al Qaeda or the Taliban.

**B. Burden of Proof**

As stated in the Amended Case Management Order that governs this case, "[t]he government bears the burden of proving by a preponderance of the evidence that the petitioner's detention is lawful." *In re Guantanamo Bay Litig.*, Misc. No. 08-442, CMO § II.A (Nov. 6, 2008); *see also Awad*, 608 F.3d at 10 (upholding the preponderance of the evidence standard as constitutional in the evaluation of habeas petitions from Guantanamo Bay detainees); *Al-Bihani*, 590 F.3d at 878 (same).[1] Accordingly, Hentif need not prove that he is unlawfully detained; rather, respondents must produce "evidence which as a whole shows that the fact sought to be proved," that Hentif was part of Al Qaeda or the Taliban, "is more probable than not." *United States v. Mathis*, 216 F.3d 18, 28 (D.C. Cir. 2000) (quoting *United States v. Montague*, 40 F.3d 1251, 1255 & n.2 (D.C. Cir. 1994)); *see also Almerfedi v. Obama*, — F.3d —, 2011 WL 2277607, at *3 (D.C. Cir. June 10, 2011) ("The preponderance standard . . . asks the court simply to 'make a comparative judgment about the evidence' to determine whether a proposition is more likely true than not true based on the evidence in the record." (quoting *Lindsay v. NTSB*, 47 F.3d 1209, 1213 (D.C. Cir. 2005)). If respondents meet this burden, the Court must deny Hentif's petition. In considering whether respondents have met this burden, the Court will evaluate the

---

1 Although the D.C. Circuit has held that the preponderance of the evidence standard "is constitutionally sufficient," it has left open the question of "whether a lower standard might be adequate to satisfy the Constitution's requirements for wartime detention." *Almerfedi*, 2011 WL 2277607, at *3 n.4.


~~SECRET~~

UNCLASSIFIED//FOR PUBLIC RELEASE

totality of the evidence, rather than viewing each piece of evidence in isolation. *See Al-Adahi*, 613 F.3d at 1105–06; *see also Salahi v. Obama*, 625 F.3d 745, 753 (D.C. Cir. 2010).

**C. Evidentiary Issues**

The Court notes at the outset two issues regarding the evidence in this case.

First, as explained in an order entered in this case on July 7, 2010 [#265], the Court has permitted the admission of hearsay evidence but considers at this merits stage the accuracy, reliability, and credibility of all of the evidence presented to support the parties' arguments. The D.C. Circuit has mandated this approach. *See Al Bihani*, 590 F.3d at 879 ("[T]he question a habeas court must ask when presented with hearsay is not whether it is admissible—it is always admissible—but what probative weight to ascribe to whatever indicia of reliability it exhibits."); *see also Odah v. United States*, 611 F.3d 8, 14 (D.C. Cir. 2010) (holding that "[t]he law is against" a detainee who argued that some types of hearsay are not admissible in these Guantanamo Bay cases); *Awad*, 608 F.3d at 7 (reaffirming the rule articulated in *Al Bihani* and noting that a district court errs not by relying on hearsay, but by relying on "unreliable hearsay"). The Court's assessment of the weight properly accorded to particular pieces of evidence appears throughout this opinion.

Second, the nature of the evidence before the Court is atypical of evidence usually presented to federal courts. Respondents have offered a variety of types of documents produced and used by government intelligence agencies that are not the direct statements of the individuals whose personal knowledge they reflect. The evidence in this case includes Form 40s ("FM40s"), Summary Interrogation Reports ("SIRs"), Intelligence Information Reports ("IIRs"), Memoranda for Records ("MFRs"), Field Documents ("FD-302s") [redacted]

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

FM40s are records of investigation activities, here witness interviews, conducted by the Criminal Investigation Task Force, a federal law enforcement agency. SIRs are summaries of interrogations conducted under the auspices of the Department of Defense. IIRs are Department of Defense documents for recording human intelligence, which may contain information derived from an SIR.[2] MFRs are similar to SIRs. FD-302s are forms completed by FBI agents summarizing interviews. [REDACTED] Neither party called any live witnesses.

## II. ANALYSIS

Hentif, or ISN 259,[4] was born in 1981 in the Al Jawf region of Yemen. At some point after turning eighteen, he left home for the city of Sana'a, Yemen. At some later date, he left Sana'a and traveled to Afghanistan. Late in 2001, he crossed the Afghan border into Pakistan and was seized by Pakistani authorities, who ultimately transferred him to U.S. custody. The parties dispute the timing and purpose of Hentif's travels and the nature of his activities while in Afghanistan. They have divided their factual disagreements into three broad issues, which the Court will address in turn.

---

[2] Human intelligence, or HUMINT, is "information derived from a person(s)." Joint Exhibit ("JE") 56 (Decl. of [3] [REDACTED] Defense Intelligence Agency, Intelligence 101 (Sept. 19, 2008)) at 1.

[REDACTED]

[4] ISN stands for Internment Serial Number. Each detainee at Guantanamo Bay has been assigned such a number.


~~SECRET~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

**A. Issue One: Whether Hentif was Recruited to Join Al Qaeda or Taliban Forces in Afghanistan.**

**1. Respondents' arguments**

Respondents contend that Hentif's purpose in leaving Yemen for Afghanistan was to fight with Al Qaeda or Taliban forces. [redacted]

Respondents further point to [redacted] details about Hentif's decision to go to Afghanistan. First, they note that Hentif reported attending the [redacted] mosque in Sana'a. *See* JE 94 (Decl. of Hentif (June 8, 2010)) ¶ 10; JE 10 (FD-302 summarizing April 13, 2002 interrogation of Hentif) at 3; JE 13 (MFR[2] [redacted] interrogation of Hentif) at 2. He stated that, at this mosque, he took a course from a man named [redacted] JE 10 at 3. This information is incriminating, according to respondents, because another Guantanamo Bay detainee, [redacted] reportedly said in an interrogation that [redacted] told him "that the struggle in [Afghanistan] was religiously supported and that one should fight if possible." JE 28 (IIR dated 2004 reporting information derived from [redacted] at 1.

[redacted]

UNCLASSIFIED//FOR PUBLIC RELEASE

Second, Hentif reportedly said during his interrogations at Guantanamo Bay that he met a man named [redacted] at this mosque, and that [redacted] played a role in Hentif's decision to go to Afghanistan. *See* JE 10 at 3; JE 13 at 2–3; JE 14 (MFR [redacted] interrogation of Hentif) at 1 [redacted] s the first person to give [Hentif] the idea to go to Afghanistan."). Respondents further assert that [redacted] "advised [Hentif] on the route of travel and informed him that he would need approximately 3000 Saudi Riyals (800 USD)," and that this information enabled Hentif to quickly depart Yemen for Afghanistan. JE 29 (IIR [redacted] at 1, 3 (reporting that Hentif moved to Sana'a in July 2001); *see also* JE 13 at 3 (reporting that Hentif left for Afghanistan in August 2001). Respondents also point to a statement in an intelligence report derived from an interrogation of [redacted] that [redacted] . . . inspired [redacted] to perform jihad in Afghanistan." JE 28 at 1. Because, respondents aver, [redacted] and [redacted] are likely the same person, Hentif too was likely encouraged to travel for purposes of jihad.

Next, respondents argue that the circumstances of Hentif's travel, in particular those surrounding his travel companion, support the proposition that Hentif embarked on the trip to become a fighter.[7] Hentif repeatedly told interrogators that he traveled to Afghanistan with

---

[7] Respondents also argue that Hentif traveled from Yemen to Afghanistan via a common Al Qaeda / Taliban route—from Yemen to Karachi to a guesthouse in Quetta, and then to guesthouses in Kandahar and Kabul. As support, respondents point to other cases that involved similar routes. *See, e.g.*, JE 7 (FD-302 summarizing interview of [redacted] at 4–5 (reporting [redacted] statements that he traveled from Sana'a, Yemen to Karachi, Pakistan to Taliban safehouses in Quetta, Kandahar, and Kabul and then to the front lines); *Al-Alwi v. Obama*, Civ. No. 05-2223, classified slip op. at 4 (D.D.C. Jan. 9, 2009) [redacted]

[redacted] *See, e.g.*, JE 10 at 3; JE 13 at 3; JE 14 at 2. [redacted] After the two flew together from Yemen to Karachi, Pakistan, [redacted] allegedly took Hentif to a guesthouse in Quetta, Pakistan. *See* JE 10 at 4. Based on Hentif's description of this house as "more like a compound," respondents ask the Court to infer that it was a place of lodging for fighters. JE 124 (MFR 2 [redacted] 2 [redacted] interrogation of Hentif) at 2; *see also id.* at 3 (noting that the house was "surrounded by 2 meter high walls of concrete").

Finally, respondents point to [redacted]

**2. Hentif's arguments**

Hentif disputes respondents' interpretation of the evidence. He argues that the Court should not rely on [redacted] This single suggestion in the record [redacted] Hentif asserts, is not sufficiently reliable to support a finding [redacted] Hentif notes that [redacted] contains at least one easily identifiable, major error [redacted] This [redacted] respondents do not dispute, is not [redacted] Hentif contends that this error suggests that other statements in the report are similarly inaccurate. He further asserts that, [redacted]

[redacted]

Next, Hentif turns to respondents' allegations about Abu Yasser. According to Hentif, unless [redacted] is the same person as [redacted] there is no basis in the record to support the proposition that [redacted] encouraged Hentif to participate in jihad in Afghanistan. And Hentif asserts that respondents have not shown that [redacted] and [redacted] are the same person. The two have different names, according to Hentif: [redacted] means [redacted] whereas [redacted] indicates that [redacted] *See* JE 1 (Decl. of [redacted], Defense Intelligence Agency, Background Declaration – Names, Aliases, Kunyas and Variants (Sept. 19, 2008)) at 2.[9] In addition, [redacted] is "from either Shabwa or Baihan Yemen," JE 13 at 4, whereas [redacted] is from Ibb, Yemen, JE 20 (SIR summarizing interrogation of [redacted] at 1. Finally, Hentif notes that [redacted] met [redacted] at

---

[redacted]

9 "Because Arabic and English have several letters representing sounds that do not correspond directly, several letters or letter combinations are used interchangeably to represent the same sound. . . . It is common to see intelligence reports referencing an individual with several different name spellings." JE 1 at 3. Accordingly, neither the parties nor the Court attach significance to spelling variations such as "Yasser" and "Yasir" or "Qahar" and "Kahar."



the [REDACTED] Institute in Ta'iz, Yemen, JE 28 at 1, whereas Hentif met [REDACTED] at a mosque in Sana'a, JE 13 at 2–3.[10] Thus, Hentif argues, the record does not support the conclusion that [REDACTED] and [REDACTED] are the same person and, therefore, there is no basis on which to conclude that [REDACTED] recruited Hentif for jihad.

Further, Hentif notes that he provided additional, innocent information about his interactions with [REDACTED] in the interrogation summaries that respondents cite. Specifically, Hentif said repeatedly that [REDACTED] suggested that Hentif travel to Afghanistan to do humanitarian work and that such work, not jihad, was the purpose of his travel. *See* JE 10 at 3; JE 11 (FD-302 summarizing May 3, 2003 interrogation of Hentif) at 1; JE 13 at 3; JE 14 at 1; [REDACTED] *see also* JE 13 at 4.

Hentif also asserts that several details about his route to Afghanistan support his innocent explanation of his travel. First, Hentif repeatedly told interrogators that he or his family paid for his plane ticket, indicating that no recruiter funded his trip.[11] This contention is corroborated by

---

[10] Respondents respond to each of these distinctions, arguing the name difference is minor, the statements regarding where each man is from are ambiguous, and the locations at which [REDACTED] and Hentif met are sufficiently close that it is likely that [REDACTED] traveled between them.

[11] *See* JE 10 at 3 (reporting that Hentif said he used money he inherited after his father's death to buy a car, and he sold the car to use the proceeds, other than a portion he gave to his brother, "to fund his travels"); JE 13 at 2–3 (same, but reporting that Hentif gave the money from selling the car to his brother, who then returned some of the money to fund Hentif's trip); JE 14 at 2 ("[Hentif] received 3000 Saudi Riyal from his brother [REDACTED] to fund his trip to Afghanistan."). Other Al Qaeda recruits have said that their travel was funded by Al Qaeda operatives. *See, e.g.*, JE 7 at 4 (reporting that [REDACTED] told his interrogator that [REDACTED] "provided the money for him to travel to Afghanistan").



a declaration from Hentif's [redacted] with whom Hentif "grew up like a brother." JE 104 [redacted] ¶ 2. [redacted] submitted a declaration confirming that Hentif sought permission in the summer of 2001 "to travel to Afghanistan to perform charitable work for the poor in that country . . . to honor the memory of his father." *Id.* ¶ 4. [redacted] also stated that he "gave [Hentif] some money for his journey." *Id.* ¶ 6.[12] Additionally, Hentif notes that he also told interrogators that he obtained a visa and made flight arrangements on his own.[13]

Second, Hentif argues that [redacted] was only a coincidental travel companion, pointing to evidence that he met [redacted] at the airport in Yemen [redacted] *See* JE 10 at 3; JE 14 at 2 [redacted] In one interrogation, Hentif reportedly explained that he did not know [redacted] or why [redacted] was traveling to Afghanistan, but he seemed likely to be

---

12 According to respondents, this declaration is not persuasive evidence of Hentif's activities because (1) it goes only to show what Hentif told his family, not what actually occurred; and (2) such a close relative is a biased witness.

13 Hentif points out that his account of making his own travel arrangements differs significantly from the stories of other Guantanamo Bay detainees whose travel was arranged by Al Qaeda recruiters. *Compare* JE 10 at 3 (reporting that Hentif said he "went to the Pakistani embassy in Sanaa and obtained a visa to travel to Afghanistan" and "looked around for airline tickets from Sanaa but saw it was cheaper to fly out of Hadramout, Yemen"), *and* JE 13 at 3 ("[Hentif] was informed by a travel agent . . . in Sanaa that he would need a visa to travel to Pakistan. He was also informed that it would be cheaper to fly from the airport in Mikala, Hydramount, Yemen than from Sanaa. [Hentif] went to the Pakistani embassy and informed them that he wished to travel to [Afghanistan] to perform humanitarian duties; they issued him a tourist visa."), *with* JE 20 at 1 ("Before leaving Yemen [redacted] gave his passport to [redacted] so [redacted] could make arrangements for the visa. Yasir returned with the passport and visa."), *and* JE 54 (FD-302 summarizing interrogation of [redacted] at 2 (reporting that [redacted] explained that he gave his passport to an Al Qaeda recruiter, who had another individual return it to [redacted] with a visa and a plane ticket from Sana'a to Karachi, Pakistan). Respondents argue in response that Hentif's decision to get a visa to enter Pakistan but not for Afghanistan demonstrates that he had assistance from a recruiter who assured him he could enter Afghanistan without difficulty.

a good travel partner because he "spoke some English." JE 29 at 4 (reporting that Hentif explained he did not inquire about the purpose of [REDACTED] travel because "it was not polite to ask"). Hentif contends that [REDACTED] is further evidence that [REDACTED] contains errors and is unreliable.

Hentif also argues that respondents have not established that [REDACTED] was connected to Al Qaeda. There is evidence in the record contradicting the proposition that [REDACTED] knew of the guesthouse where he and Hentif stayed in Quetta: one of Hentif's interrogation summaries reports that Hentif said "neither [Hentif] nor [REDACTED] had knowledge of the house before they were taken there; the taxi driver drove them to the house/clinic simply because they were Arabs." JE 29 at 4. It is not even clear, Hentif argues, that there is anything incriminating about the house in Quetta; while respondents draw inferences from the structure of the building, a wall around a house does not demonstrate that fighters stay there.[14] [REDACTED] Hentif contends that its significance is unknown. [REDACTED]

---

14 [REDACTED]

3. **Court's findings**

The Court first addresses [redacted] The Court will not discount [redacted] based solely on the mistaken [redacted] On the contrary, the Court finds [redacted] to be strong evidence [redacted] The Court finds [redacted] to be an accurate representation [redacted] Thus, the Court will take [redacted] into account when considering whether Hentif was part of Al Qaeda or the Taliban.

The Court notes, however, that there is also evidence supporting the conclusion that Hentif did not travel to Afghanistan as an Al Qaeda recruit. For instance, his preparation for his trip—inquiring with a travel agent, obtaining a visa on his own, and purchasing a cheaper flight from Hadramout—is inconsistent with the way Guantanamo Bay detainees who admit to being recruited for jihad have described the circumstances of their travel to Afghanistan.

Next, the Court turns to the parties' dispute about the identity of [redacted] The Court sees no basis to find that [redacted] and [redacted] are the same person. Hentif notes that [redacted] name, his place of origin, and the location where he met Hentif all conflict with [redacted] description of [redacted] A mismatch as to one of these facts might not disprove the

allegation that the two men were the same person, but the Court will not make such a finding where all three are different.

Finally, the Court considers the evidence regarding Hentif's travel companion [redacted] The evidence regarding [redacted] is mixed. Interrogation summaries say that Hentif met [redacted] at the airport in Hadramout. They also say both that [redacted] ed Hentif to the guesthouse in Quetta and that [redacted] was not previously familiar with the house. The Court has no satisfactory means of resolving these contradictions. There is, however, one piece of particularly damning evidence regarding [redacted] The Court will consider this evidence in context and with the rest of the evidence in the record.

**B. Issue Two: Whether Hentif Stayed at an Al Qaeda Guesthouse in Kandahar Operated by [redacted]**

**1. Respondents' arguments**

Respondents see strong evidence of Hentif's affiliation with Al Qaeda in the fact that, after entering Afghanistan, he went to a guesthouse in Kandahar run by [redacted] Hentif admitted that he stayed at this guesthouse for approximately five days. *See* JE 10 at 4; JE 11 at 1; JE 14 at 3; [redacted] According to respondents, the statements of other detainees support their assertion that [redacted] was a member of Al Qaeda and that he ran an Al Qaeda guesthouse in Kandahar. *See* JE 8 (FD-302 summarizing interrogation of [redacted] at 2 [redacted] knew [redacted] to be an Al-Qaeda member and the [redacted] guest house."); JE 47 (IIR dated January 14, 2002, derived from information provided by a Libyan Al Qaeda member) at 1 (referring to an Al Qaeda

guesthouse in Kandahar "which was being operated by a Yemen national named ██████ *see also Al-Alwi v. Obama*, Civ. No. 05-2223, classified slip op. at 4–5 (D.D.C. Jan. 9, 2009). They argue that, because Al Qaeda is a secretive organization, the proper inference to be drawn from Hentif's presence at this guesthouse is that he too was part of Al Qaeda. *See* JE 2 (Decl. of ██████ Defense Intelligence Agency, Background Declaration – Guesthouses (September 19, 2008)) at 3 (explaining that guesthouses were used as transition points for fighters going to training camps and noting that "[t]hese guesthouses were not available to the public, but rather were restricted to individuals with specific definable connections to al-Qaida").[16]

Further establishing that Hentif was affiliated with Al Qaeda, respondents argue, are the facts that



---

[16] Respondents also argue that the fact that the house had a surrounding wall, suggesting that it was meant to be secure and closed off, further supports the inference that it was an Al Qaeda guesthouse. *See* JE 54 (FD-302 summarizing interrogation of ██████ at 3 (reporting that ██████ described the guesthouse where he met ██████ as having a "three [] meter brown perimeter wall" and "a solid, green steel gate"); JE 14 at 3 (reporting that Hentif said the guesthouse had "a wall around the outside that blocked the view of the house from the street").

~~SECRET~~

[redacted]

Finally, respondents set forth two additional allegations to support their position that Hentif's stay at [redacted] guesthouse demonstrates that he was part of Al Qaeda. The first is that the guesthouse served as a transit point for Hentif to attend an Al Qaeda tactical training course. [redacted] Respondents contend that the name [redacted] is consistent with Hentif's admitted usage of the alias [redacted] and his Yemeni citizenship. *See* JE 13 at 1 (reporting that Hentif said that [redacted] was a nickname he has used since childhood); JE 1 at 12 (noting that [redacted] means from Yemen). [redacted]

[redacted] *See, e.g.*, JE 60 (SIR [redacted] interrogation of Hentif) at 1 (reporting that Hentif said he received training in Yemen) [redacted]

Respondents' second additional allegation is that Hentif was captured with a Casio watch of a type that many terrorists possessed. *See* JE 12 (MFR dated June 26, 2002) at 1 (listing Hentif, by his ISN number, as a person in possession of a "silver version" of the "Casio F-91W"). This model of watch "has been used in bombings that have been linked to Al-Qaida and radical Islamic terrorist groups with improvised explosive devices." *Id.*; *see also* JE 6 (Decl. of [redacted] Defense Intelligence Agency, Background Declaration – Casio F-91W Watch) at 1 [redacted] Respondents, citing a recent opinion of the D.C. Circuit, argue that the Court must take Hentif's possession of this watch into account in reaching its decision. *See Al-Adahi*, 613 F.3d at 1109

---

[redacted]

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

(explaining with disapproval that the district court "threw out the[] telling facts" that the petitioner had been seen wearing and was captured with a Casio watch).

**2. Hentif's arguments**

Hentif does not dispute that he stayed at a guesthouse in Kandahar run by [redacted] He does, however, dispute the implications of his stay there. First, he argues that respondents have not shown that the house was used exclusively by persons connected to Al Qaeda. In particular, he notes that although respondents rely on a declaration from an intelligence agency employee to support that contention, *see* JE 2 at 3, detainees with first-hand knowledge of the house's operation indicate that it was open to anyone. *See* JE 54 at 3 (reporting that [redacted] said [redacted] guesthouse "was open to anyone that needed a place to stay"); JE 68 (FM 40 summarizing interrogation of [redacted] at 2 (reporting that [redacted] said the [redacted] guesthouse, which respondents assert was [redacted] guesthouse, "was for everyone"). Moreover, Hentif notes, he has said that he did not know if [redacted] was connected to any terrorist group and that he did not know or get to know the other occupants of the house. JE 11 at 1; Government Exhibit ("GE") 1 (MFR [redacted] interrogation of Hentif) at 1; JE 22 (SIR [redacted] interrogation of Hentif) at 2 ("[Hentif] reiterated that he was not well received at the Arab guesthouse in Kandahar. He felt like an outsider and did not make any acquaintances aside from [redacted] the owner of the guesthouse. . . . [redacted] was merely a hospitable Arab man living in Kandahar who opened his [] home to fellow Arabs passing through Kandahar.").[19]

---

[19] Respondents counter that Hentif has been inconsistent about his reception at [redacted] guesthouse. Once, he reportedly said that he and [redacted] "were welcomed at the


SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

As to respondents' inculpatory interpretation of the fact that



house; food, prayer time, and conversation were offered." JE 14 at 3. At another time, he said he "was not well received" and "felt like an outsider." JE 22 at 2. 1.5



Hentif also disputes that has the significance that respondents attribute to it. First, he asserts that he never Second, he notes that does not refer to Finally, he argues that is unknown.[22]

Next, Hentif vigorously disputes the allegation that he attended training camps in Afghanistan. *See* JE 60 at 1; *see also* JE 94 ¶ 22 ("I never registered for training of any kind and I never heard from anyone while I was in Afghanistan that my name appeared on any list for training."). He also argues that the lists indicating that registered for training do not refer to him. He notes that the name appears in five places in the relevant set of documents, *see* JE 37 at 1, 48–49, 56, 70, 85, but respondents only contend that two might refer to him, *id.* at 48–49, 70. He argues that this fact shows that is a common name. Further, respondents connect these two appearances of the name to Hentif only because the in those instances is from Yemen or Al Jawf, a region of Yemen. This, according to Hentif, is not a sufficient basis on which to conclude that the name in those two instances, refers to him. Additionally,

---

22 Respondents argue in rebuttal that is irrelevant;

Hentif notes that in one instance the list refers to [redacted] which means [redacted] not that the person himself is named [redacted] *See id.* at 48–49. The list also indicates that [redacted] arrived in Afghanistan in September 2000, *id.*, the year before Hentif contends he left Yemen. *See* JE 94 ¶ 16 (stating that he traveled to Afghanistan in the summer of 2001); JE 13 at 3 (same); *see also* JE 104 ¶¶ 4–5 (stating that Hentif asked his family, including his cousin [redacted] for permission to travel to Afghanistan in the summer of 2001).[23] In light of these discrepancies, Hentif concludes, the training lists do not support the contention that he attended a training camp.

**3. Court's findings**

There is no dispute that Hentif stayed at [redacted] guesthouse in Kandahar for approximately five days. And Hentif concedes that [redacted] was affiliated with Al Qaeda, although Hentif maintains that he was not aware of that affiliation or why other guests at the guesthouse were there. Staying at an Al Qaeda-affiliated guesthouse is "powerful—indeed 'overwhelming'—evidence" that an individual was part of Al Qaeda. *Al-Adahi*, 613 F.3d at 1108 (quoting *Al-Bihani*, 590 F.3d at 873 n.2)). Consequently, the Court will take this evidence into account in considering respondents' case.

---

[23] Respondents question Hentif's credibility as to this point. They argue that Hentif's timetable, in which he first moved from Al Jawf to Sana'a in the summer of 2001 but left for Afghanistan that same summer, is so compressed as to be likely untrue. Furthermore, they point to Hentif's assertion that he moved to Sana'a after receiving his inheritance from his deceased father upon turning 18, which, because he was born in 1981, would have occurred in 1999. Finally, they argue that [redacted] declaration is not probative because, if [redacted] spoke to Hentif on the phone about whether Hentif could go to Afghanistan, Hentif might have been hiding from his family that he had already left Sana'a.

~~SECRET~~

The Court will also consider the evidence that [redacted] The Court is not persuaded by [redacted] Hentif's explanation for [redacted] is not plausible. It does not make sense that Hentif would [redacted] And the inconsistencies [redacted] further undermine the credibility of his explanation. Therefore, given that Hentif lodged at an Al Qaeda guesthouse, the Court finds that it is likely [redacted] The Court is also mindful that the falsity of Hentif's explanation [redacted] has its own evidentiary significance. *See Al-Adahi*, 613 F.3d at 1107 ("[F]alse exculpatory statements are evidence—often strong evidence—of guilt.").

It is also significant that [redacted] Hentif's argument that he does not [redacted] cannot overcome the other [redacted] information that indicates [redacted] Although Hentif correctly points out that [redacted] is unclear, the Court need not know [redacted] in order to take into account that it likely [redacted]

Thus, [redacted] has probative value that the Court will consider.

Next, the Court finds that respondents have not shown that Hentif attended training courses while in Afghanistan. The Court will not draw any inculpatory inferences from the fact that the name [redacted] appears on lists that are apparently rosters for training courses. Hentif's arguments as to this point are persuasive. In particular, although the roster refers to an individual (or perhaps multiple individuals) named [redacted] who is from Yemen and Al Jawf, nothing else about the roster suggests that the name [redacted] refers to Hentif, and the date in 2000 strongly suggests otherwise. Respondents have no other evidence showing that Hentif arrived in Afghanistan before the summer of 2001, whereas the declaration of Hentif's cousin [redacted] corroborates Hentif's statements that he departed for Afghanistan in 2001. Moreover, Hentif has consistently denied the allegation that he attended training camps.

There is no dispute, however, that Hentif possessed a Casio watch of a model often used by Al Qaeda operatives. The Court will take that fact into consideration when considering respondents' evidence as a whole.

**C. Issue Three: Whether [redacted] Instructed Hentif to Travel to Another Guesthouse in Kabul, Where He Stayed Immediately Before Working for Two Individuals with Significant Ties to the Taliban and Al Qaeda.**

Hentif has said repeatedly that, while in Afghanistan, he lived with a man he knew from Yemen [redacted] and did volunteer work for the [redacted] under the supervision of men named [redacted] and [redacted] Respondents contend that all three men had connections to Al Qaeda and/or the Taliban.

~~SECRET~~

### 1. [redacted]

#### a. Respondents' arguments

According to respondents, [redacted] suggested that Hentif seek out [redacted] also known as [redacted][24] a Yemeni living in Afghanistan. *See* JE 14 at 3 ("[Hentif] stated that when he informed [redacted] that he was from Al Jouf, Yemen, [redacted] offered information on an individual named [redacted] currently working in Kabul, who was also from Al Jouf, Yemen."). And, respondents argue, even if [redacted] was not the source of the idea that Hentif find [redacted][25] the two men were nevertheless connected, because [redacted] knew that [redacted] was in Kabul. JE 10 at 4; JE 15 (MFR [redacted] interrogation of Hentif) at 2.

Respondents note that Hentif told interrogators that [redacted] sent him to Kabul to the house of a man named [redacted] whom [redacted] said would be able to find [redacted] *See* JE 10 at 4; JE 15 at 2. Respondents argue that [redacted] house was a Taliban guesthouse. As support for this contention, they point to [redacted]

---

[24] Hentif explains in his declaration that these names mean [redacted] from the north and [redacted] from the east, respectively, and people called this man by both names depending upon where they lived in relation to his hometown in the northeast of Yemen. JE 94 ¶ 7.

[25] Respondents acknowledge that the interrogation summary in which the statement supporting their contention appears also says that "[Hentif] later claimed that when he arrived at the house in Kandahar he asked [redacted] if he knew the whereabouts of [redacted] [Hentif] claims that he knows [redacted] because he was his Koran teacher back in Yemen; [Hentif] also knew that [redacted] was working in Afghanistan." JE 14 at 3. Because "the interpreter was very clear that [Hentif] changed his statement, it was not a translation problem," *id.*, respondents assert that Hentif's first statement, that [redacted] suggested he find [redacted] is more likely true than the one that respondents categorize as a cover story, that Hentif knew [redacted] before embarking on his trip.

~~SECRET~~



Next, they note that Hentif described the house as follows:

> This house was located in the Wazir Akbar Khan section of Kabul; [Hentif] could not identify an[] exact location. It was a two level structure with a small yard and a high wall that blocked the view from the street. There was a driveway large enough for one car. There [were] approximately fifteen Arabs in the house at any given time; people came and went regularly. [Hentif] stated that there were only Arabs at the house and none of them had families.

JE 15 at 3. Respondents argue that this description supports the inference that the house was for fighters, because: (1) another detainee said during an interrogation that he stayed at a Taliban guesthouse in this same neighborhood, *see* JE 7 at 2; (2) the house had a high wall; (3) only single men stayed there; and (4) the house was close to a battle being fought near Kabul.

Respondents find further support for this theory in the fact that Al Ansari was able to locate [REDACTED] who came to [REDACTED] house to retrieve Hentif and take him to [REDACTED] home. JE 10 at 4 [REDACTED] met [Hentif] at [REDACTED] house after receiving a message from [REDACTED] that he was there."); JE 15 at 3. This fact is incriminating, respondents assert, because [REDACTED] was a fighter at Tora Bora.[26] They base this allegation on: (1) the statements of a detainee that an [REDACTED] who was "40 years of age, [and] from Saudi Arabia" fought with him in Tora Bora, *see* JE 8 at 4; (2) the appearance of the name [REDACTED] on a list of "Al Qaeda members" who were to attend "tactics course no. 2" in March

---

[26] A cave complex at Tora Bora was the site of a December 2001 battle in which the Taliban and Al Qaeda fought against the United States.



~~SECRET~~

2001, *see* JE 34 (IIR [redacted] at 1, 3; and (3) the fact that the Department of Defense obtained a note sent from [redacted] to another individual congratulating him "on the assassination of [redacted] and the Americans," *see* JE 33 (IIR containing translated text of letter) at 1, 3.

**b. Hentif's arguments**

Hentif maintains that the explanation of how he went from [redacted] guesthouse to [redacted] home is not incriminating. He asserts that he went to [redacted] house with the intention of finding [redacted] whom he knew as a Koran teacher in Yemen. JE 10 at 3–4; JE 14 at 3; JE 15 at 2.[27] He asked [redacted] for help in locating [redacted] and [redacted] told him that [redacted] in Kabul could locate [redacted] JE 10 at 4; JE 15 at 2. His travel to Kabul, then, was for the purpose of finding [redacted] and his stay at [redacted] house—where, as at [redacted] house, he was aware of no indication of any affiliation with a terrorist group—was innocent. *Cf.* JE 15 at 3 ("[Hentif] claims no one at [redacted] house was ever armed.").

As to [redacted] himself, Hentif notes that his interrogation summaries give no indication that Al Shamali was anything other than a Yemeni who lived in Afghanistan with his wife and child and taught the Koran at a mosque. JE 15 at 3 (reporting that Hentif said [redacted]

---

[27] Hentif's declaration provides additional detail about how he had come to know [redacted] JE 94 ¶ 6 ("When I was about eleven years old, I met a family friend, [redacted] He was older, and taught the Koran to young boys in a nearby mosque. I attended his courses for about two years. [redacted] did charitable work for the poor, and I looked up to him because of his knowledge and charity."). Respondents note, however, that during an interrogation, Hentif reportedly said that "when he was eighteen," rather than eleven, "[Hentif] and eight or nine other youth attended a week long course," rather than courses over two years, "about the Koran given by [redacted] Yemen," JE 14 at 3, arguing that these stories are inconsistent.



lived with his wife and one year old son in a two level house" and referring to "the mosque that worked at located approximately 500 meters from the house") *see also* JE 15 at 4 ("[Hentif] claims that was not affiliated with any organization. He coordinated on his own to teach Afghani children to recite the Koran.").

Further, Hentif contends that the differences in the descriptions of the about whom respondents have incriminating information and the whom Hentif knew belie the contention that they are the same person. Specifically, the detainee who identified as having fought at Tora Bora said that was a Saudi, JE 8 at 4, whereas the whom Hentif knew was from Yemen, JE 30 at 2 (reporting that Hentif said was from "Al Zahar, Yemen"). The same detainee also said that was 40, JE 8 at 4, but Hentif described as "in his early thirties," JE 30 at 2. Moreover, the men had different names versus [28]) and different family circumstances; there is no mention of the Taliban-affiliated having a wife or child in Afghanistan, but Hentif reports that the he knew lived in Afghanistan with, and left the country accompanied by, his wife and child. *See* JE 15 at 3; JE 16 at 2. Further, the whom respondents identify was at the battle of Tora Bora when Hentif was making his way from Afghanistan to Pakistan.

---

28

Finally, Hentif argues that the information he provided to interrogators about [redacted] —the only information in the record that is definitely connected to the person Hentif knew—is not inculpatory. Despite respondents' contention that [redacted] connections to [redacted] and [redacted] are suspicious, Hentif asserts that it is not surprising that Yemenis in Afghanistan would form a network and be able to locate each other.

c. **Court's findings**

Respondents have demonstrated that [redacted] a person whom Hentif knew and sought out in Afghanistan, is connected to [redacted] Hentif told interrogators, and does not now dispute, that [redacted] sent Hentif to Kabul because he knew [redacted] was there. Although [redacted] did not know precisely where [redacted] was, he knew that [redacted] would take in Hentif and be able to locate [redacted] And again, there is no dispute about [redacted] affiliation with Al Qaeda. The explanation that Hentif has offered for the connection between these men—that they knew each other only because they were all Yemenis living in Afghanistan—is not supported by any evidence in the record.

The Court does not find, however, that [redacted] house was an Al Qaeda guesthouse. It is true that [redacted] a recognized Al Qaeda operative, sent Hentif from his guesthouse in Kandahar to [redacted] guesthouse. And there is evidence that a guesthouse for fighters existed in the neighborhood of Kabul where [redacted] house was situated. But, while these facts make respondents' contention possible, they are not sufficient to support the conclusion [redacted] operated an Al Qaeda guesthouse.[29]

---

[29] Respondents have not provided evidence about [redacted] other than from Hentif's statements and several of their arguments about why [redacted] house was likely to be an Al



Similarly, the Court finds insufficient support for respondents' assertion that the whom Hentif knew is the same man who attended training camps and fought at Tora Bora. As Hentif points out, the descriptions of these two men—including their nationalities and family statuses—are different. And there is no indication in the record that the whom Hentif knew was a fighter. Furthermore, the similarities in the names of the two men are less meaningful than might be the case under other circumstances; is not a unique name and refers to a direction, not a location, so it could be the alias of an individual of any nationality. Consequently, although the Court will consider the connection between and it does not find that the whom Hentif knew was a fighter for Al Qaeda or the Taliban.

**2. and**

**a. Respondents' arguments**

Respondents argue that and whom Hentif said were affiliated with the were in fact associated with the Taliban.

---

Qaeda guesthouse have little merit. Specifically, respondents have not shown that the presence of a wall around the house distinguished it from any other house in Kabul. Similarly, that single men stayed in the house is not evidence of an affiliation with terrorists. *See* JE 80 (Decl. of Dr. Sheila Carapico) ¶ 18 (explaining that "[t]he fact that a young Yemeni stays at 'guest houses' while in . . . Afghanistan does not itself imply anything menacing or illicit" because "it is common for such a man traveling abroad to seek economical, safe accommodations"). Finally, respondents' argument that house was likely for fighters because it sits in the general vicinity of a battle is so broad as to be meaningless; this argument would apply to almost any home in Kabul.



As to [redacted] respondents first point to information obtained from a Guantanamo Bay detainee about a Taliban training camp named for the Taliban commander [redacted] who ran it. JE 23 (IIR derived from interview 2 [redacted] at 4 ("The camp was named after its Taliban commander, [redacted] and was situated between the cities of Kabul . . . and Bagram."). [redacted] *Id.* Another detainee said he went to a house in Kabul where an Afghan named [redacted] handled all [] business" other than cooking. JE 25 (IIR summarizing FBI interrogation of [redacted] at 2. Respondents argue that this evidence demonstrates that [redacted] was a commander who managed recruits, moving them from a guesthouse in Kabul to battle. If Hentif was working under [redacted] respondents contend, then he too must have been a member of the Taliban.

Based on statements of other Guantanamo Bay detainees, respondents identify [redacted] as an individual whose real name was [redacted] and who used the names [redacted] and [redacted] as aliases. *See* JE 50 (IIR 2 [redacted] derived from [redacted] at 2 [redacted] learned that [redacted] worked with Arabs in Kabul and Qandahar during the Taliban regime. [redacted] true name was [redacted] had been known by the alias [redacted] prior to the battle of Tora Bora."); JE 52 (FM 40 summarizing interrogation of [redacted] at 1–2 (reporting that [redacted] who admitted to working for members of Al Qaeda and the Taliban, included the name [redacted] on a list of members of a group 1 [redacted]. [redacted] according to one detainee, ran training courses and was connected to [redacted] JE 50 at 2. Again,

respondents argue that, because Hentif worked for this man, he must have been part of the Taliban.

To further bolster their contention that these two men are those whom Hentif knew, respondents note that evidence in the record connects [redacted] and [redacted] The detainee who told an interrogator that [redacted] was a member of a particular group also included [redacted] on the list of individuals who joined that group. JE 52 at 2. This detainee also said that he delivered money from a man he identified as a member of Al Qaeda and the Taliban, JE 52 at 1–2, to [redacted] and [redacted] JE 53 (SIR summarizing interrogation of [redacted] at 1.

Relying on this information, respondents again argue [redacted]

That [redacted] is consistent, respondents argue, with the previous events they describe, such as Hentif's travel for the purpose of jihad and his stays at Al Qaeda guesthouses. Furthermore, they note, there is no evidence in the record corroborating Hentif's statements about his work for the [redacted]

**b. Hentif's arguments**

Hentif argues emphatically that the [redacted] and [redacted] he encountered in Afghanistan are not the same men about whom respondents have incriminating information. First, Hentif points to the detailed information in his interrogation summaries about how he met

these men and the innocent work he did for them. One particularly specific interrogation summary indicates that Hentif said:

> Through his work as a Koran teacher, [REDACTED] knew an Afghani man named [REDACTED] that worked as a driver for the [REDACTED] He informed [REDACTED] that [Hentif] wanted to work for a humanitarian organization. [Hentif] started working directly with [REDACTED] on a daily basis; [REDACTED] spoke some Arabic. [Hentif]'s daily duties were to ride with [REDACTED] and pick up medical or food supplies and deliver them to different locations around Kabul. A Toyota cargo van was used for deliveries. He frequently worked in villages that were plagued by mines and had many land mine victims. Occasionally [REDACTED] would have [Hentif] accompany him on supply runs that required the two to go to the Afghani [REDACTED] supply depot and pick up supplies. The depot was located in the Shar-e-now district of Kabul. The [REDACTED] supply depot was [a] staffed facility that was surrounded by gates. There were no security guards. [REDACTED] does not know where the supplies in the [REDACTED] facility came from. The first line supervisor for [REDACTED] was an Afghani man named [REDACTED] he did not speak Arabic.

JE 15 at 4. Hentif notes that [REDACTED] he had distributed medical supplies [REDACTED] and has consistently reaffirmed this version of events, JE 10 at 4; JE 16 at 1–2;[31] JE 30 at 1 [REDACTED] JE 94 ¶¶ 23–24.[32]

---

30 [REDACTED]

31 This interrogation summary provides an explanation for the lack of corroborating evidence that Hentif worked for the [REDACTED] "[Hentif] was not an official employee of [REDACTED] He signed no contract and was paid no salary. He was simply a volunteer and the only people who could corroborate his employment with [REDACTED] are [REDACTED] and his supervisor, [REDACTED] JE 16 at 1.

32 Respondents argue that Hentif's story is implausible. First, Hentif said he had permission from his family to spend only three months in Afghanistan, yet he went without prearranged plans. *See* JE 10 at 3. Second, information respondents acquired from the [REDACTED] web site indicates that Hentif's alleged employment did not comply with their policy, which, as respondents understand it, requires that volunteers live in the country in which they work. *See* Government Exhibit ("GE") 2 at 1. Third, he had no medical or other training to prepare him for the position he says he held. Fourth, he was not able to name the villages to which he allegedly traveled as part of his work, even when shown a map of Kabul. *See* JE 30 at

~~SECRET~~

Second, Hentif points to differences between the physical descriptions of [REDACTED] and [REDACTED] in the intelligence reports on which respondents rely and those in Hentif's interrogation summaries. These differences, Hentif argues, further demonstrate that the men about whom respondents have information are not the same ones he knew.[33]

As noted above, one detainee described [REDACTED] as [REDACTED] JE 23 at 4. In contrast, Hentif said that [REDACTED] JE 30 at 2. These descriptions are sufficiently different, Hentif asserts, to undermine the proposition that they refer to the same man. Hentif also notes that respondents represented in the case of another Guantanamo Bay detainee that [REDACTED] is a common name, further calling into question the significance of respondents' identification of the [REDACTED] who is affiliated with terrorist groups. *See* JE 72 (*Ali Ahmed v. Obama*, Civ. No. 05-1678, classified slip op. (May 4, 2009)) at 28 (noting that respondents told the court that "[i]f you run the name [REDACTED] through [a search of the government's records] you will get thousands, potentially tens of thousands of documents or hits").[34]

---

3; JE 16 at 1.

[33] Respondents counter that each of the descriptions Hentif gave, described below, are vague. They argue this lack of specificity is evidence that he was using counterinterrogation techniques and renders the information he provided insignificant for purposes of determining whether his descriptions of these men conflict with those given by other detainees.

[34] To demonstrate that in addition to [REDACTED] is not a unique name, Hentif provided to the Court a document found by searching the internet for the name, which shows that the Combatant Status Review Board determined that [REDACTED] a Syrian, was a member of the Taliban who ran a guesthouse in Kabul. JE 78 (Combatant Status Review Board memo (Oct. 5, 2004)) at 1.



~~SECRET~~

Hentif also points to the descriptions of [redacted] in the interrogation summaries respondents cite. One detainee said [redacted] was "an Afghani translator" who spoke Arabic, Pashtu, and Farsi, [redacted] JE 108 (FD-302 summarizing interrogation of [redacted] at 1. He also explained that [redacted] one of [redacted] other aliases, references [redacted] height: [redacted] is a name of a tall tree and [redacted] was tall as [redacted] tree." JE 52 at 2. Another detainee who knew [redacted] to be "an intelligence officer for the Taliban" said [redacted] was [redacted] JE 107 (IIR derived from interrogations of [redacted] at 2–3.[35] In contrast, Hentif described [redacted] as [redacted] and noted he [redacted] JE 30 at 2; *see also* GE 1 at 2 (reporting that Hentif described [redacted] as [redacted] and [redacted] According to Hentif, these differences—most notably in the description of [redacted] height, but also the length of his beard, color of his eyes, age, and language abilities—mean that the [redacted] whom Hentif knew could not have been the same man as the [redacted] about whom respondents have incriminating evidence.

Third, Hentif notes that the documents to which respondents point containing the names [redacted] and [redacted] make no reference to Hentif, [redacted] or any other person who had a role in Hentif's story. The coincidence of finding these two names together is not, Hentif

---

[35] This man is almost certainly the one respondents identify; this detainee says [redacted] was "also known as [redacted] JE 107 at 3.

~~SECRET~~

argues, sufficient to support the inference that he was connected to these two men with Taliban ties.[36]

### c. Court's findings

The Court will not draw inculpatory conclusions based on respondents' evidence regarding these two men. First, respondents have not produced sufficient evidence to support their claim that Hentif's story about distributing medical supplies is fabricated. Hentif provided to his interrogators a detailed explanation of his activities, describing the men for whom he worked, the nature of his assistance, the vehicle they used, and the locations to which they traveled. Respondents have offered no alternative explanation of how Hentif spent his time in Kabul [REDACTED]

Second, the Court will not infer from the names and alleged affiliations of [REDACTED] and [REDACTED] that, to the extent that Hentif delivered medical supplies, he did so on behalf of the Taliban. The descriptions of [REDACTED] and [REDACTED] provided by Hentif do not match the descriptions provided by other detainees of men named [REDACTED] and [REDACTED] who were affiliated with the Taliban. Most notably, the [REDACTED] whom respondents identify is consistently described as being very tall and as having several names and aliases, whereas Hentif does not describe the [REDACTED] he knew as being tall or having any other name. Furthermore,

[36] Respondents rejoin that Hentif had already left Afghanistan in 2002, when the group of which they were both allegedly members came together, according to the detainee who described it. JE 52 at 1–2.

SECRET

there is no indication in the record that either of the Taliban-affiliated men respondents identify played any role in distributing medical supplies for that group.

In sum, the evidence in the record supports the contention that Hentif delivered medical supplies while in Kabul. Because the Court finds that respondents have failed to support with reliable evidence their theories about the identities of [REDACTED] and [REDACTED] the evidence as to whether Hentif did that work on behalf of the Taliban or the [REDACTED] consists only of conflicting reports of Hentif's statements as to that question. The Court will take this evidence into account when considering the respondents' case as a whole.

**3. Departure from Afghanistan**

**a. Respondents' arguments**

Finally, respondents argue that the circumstances of Hentif's departure from Afghanistan provide strong, albeit indirect, evidence that Hentif fought at, and subsequently fled from, the battle of Tora Bora. Hentif's version of events, respondents contend, is not credible. Hentif explains in his declaration that, after the United States invaded Afghanistan, he traveled with [REDACTED] and [REDACTED] family from Kabul to Logar, a province in Afghanistan, where they stayed for a month in a house that [REDACTED] rented. JE 94 ¶ 30. In November 2001, they relocated to Jalalabad, where they stayed with a man named [REDACTED] *Id.* ¶ 31.[37] After [REDACTED]

---

37 [REDACTED]

[redacted] and his family left to cross the border, Hentif followed Afghan guides across the mountains out of Afghanistan. *Id.* ¶¶ 34–36. Respondents question why Hentif did not leave Kabul more quickly after the September 11 attacks and why he fled in the direction of Logar instead of to Kandahar and Quetta, the way he had entered the country. They also assert that Hentif has offered inconsistent accounts of what he did while in Logar province; he once said that he and [redacted] "would go to a small mosque near the house to pray and for [redacted] to teach the Koran to children," JE 10 at 4, while on another occasion he said that "[t]hey shopped in the local market, prayed at home, and did not work," noting that [redacted] did not teach the Koran to anyone except for [Hentif]," JE 16 at 2. Respondents further note that Hentif did not describe to interrogators his activities while in Jalalabad or explain why he was so delayed in leaving Afghanistan. Respondents argue that, for all these reasons, Hentif's story should not be believed.

The more likely explanation for Hentif's movements, respondents assert, is that he was a fighter. After the battle of Tora Bora, many Arab fighters fled to Pakistan. JE 42 (Decl. of [redacted] Defense Intelligence Agency – Tora Bora (Oct. 19, 2009)) at 3. That battle ended in mid-December 2001. JE 43 (Decl. of Lt. Col. [redacted] U.S. Army (Apr. 28, 2010)) at 5. Hentif was seized at the border of Afghanistan and Pakistan [redacted] Further, Hentif asserts he traveled most of the way to the border with [redacted] who, as explained above, respondents contend was a fighter at the battle of Tora Bora. And Hentif told interrogators that his trip from Jalalabad to the border was lengthy and required a guide, which respondents assert suggests that he was coming not from Jalalabad but from the Tora Bora mountains. *See* JE 10 at 5 ("[Hentif]

[redacted] JE 16 at 3 ("[Hentif] and [another Yemeni fleeing Afghanistan] were informed . . . that it would take one day to make the journey into Pakistan[redacted]

b. **Hentif's arguments**

Hentif disputes respondents' contention that he was not forthcoming about his activities while leaving Afghanistan. He asserts that he consistently explained to interrogators where he went, how long he stayed there, and how he kept occupied while waiting to move on. *See* JE 10 at 4 (reporting that Hentif said he traveled with [redacted] and his wife to Logar, where they stayed for a month, "during which time they would go to a small mosque near the house to pray and for [redacted] to teach the Koran to children," and then they traveled to Jalalabad, where they "stayed at [redacted] house . . . for about 20 days"); JE 16 at 2–3 (reporting that Hentif described in some detail his departure from Kabul with [redacted] family, their one-month stay in Logar, during which they "shopped in the local market, prayed at home, and did not work," and their move to the home of [redacted] in Jalalabad, where they stayed for twenty days). Hentif also notes that he provided explanations for not leaving Afghanistan as quickly as possible. In Logar, "they were far from where the war was going on and felt that if it got close they could just cross the border to Pakistan." JE 10 at 4.[38] And in Jalalabad, "[t]he twenty day wait was due to the fact that [redacted] was waiting for the people who could guide [Hentif] and [redacted] family through the border." JE 16 at 3.

---

[38] Hentif said in another interrogation that "[t]he purpose of staying in Logar was so [redacted] could figure out a way to leave Afghanistan without problems." JE 16 at 2.

~~SECRET~~

c. **Court's findings**

The Court does not find that Hentif was a fighter at Tora Bora. As explained above, respondents have failed to show that the [redacted] to whom Hentif refers is the same [redacted] who fought at Tora Bora. The remaining evidence on which respondents rely to discredit Hentif's account consists primarily of Hentif's statements that traveling from Jalalabad to the Pakistani border [redacted] This evidence is insufficient to show that Hentif fought at the battle of Tora Bora.

**D. Conclusion**

The presentation of the evidence in this case and the Court's analysis of that evidence in this memorandum opinion track three broad factual issues about which the parties disagree. In arriving at the ultimate determination whether Hentif was part of Al Qaeda or the Taliban, however, the Court considers the evidence as a whole. Doing so, the Court finds that respondents have carried their burden by a preponderance of the evidence.

Not all of respondents' arguments are supported by sufficient reliable evidence. For example, as explained above, they have failed to prove that Hentif participated in Al Qaeda training or fought at the battle of Tora Bora. But the following evidence shows that it is more likely than not that Hentif was a part of Al Qaeda or the Taliban.[39]

First, [redacted] This [redacted] is strong evidence that he was part of Al

---

[39] As discussed in the individual sections of this memorandum opinion, there is further incriminating evidence in the record, but the Court will not exhaustively catalogue it here. The following evidence is sufficient to show that Hentif's detention is lawful.

Qaeda or the Taliban. Further, it undercuts his proffered explanation for his presence in Afghanistan—that he had gone to help poor Afghans and do something good in memory of his deceased father.

Second, [redacted] While [redacted] is unknown, that [redacted] is probative of his affiliation with Al Qaeda. [redacted] It is also significant that [redacted] with whom Hentif traveled to Afghanistan [redacted] indicating that he too was likely connected to Al Qaeda.[40]

Third, Hentif admits to having stayed at a guesthouse in Kandahar [redacted], a well-known Al Qaeda operative.[41] The D.C. Circuit has made clear that staying at an Al Qaeda guesthouse is "overwhelming" evidence of an affiliation with Al Qaeda. *See Al-Adahi*, 613 F.3d at 1108 (quoting *Al-Bihani*, 590 F.3d at 873 n.2); *see also Uthman*, 637 F.3d at 406. Although Hentif claims that he was not aware that his lodging was an Al Qaeda guesthouse, the

---

[40] Additionally, [redacted] also stayed at [redacted] guesthouse with Hentif, providing further evidence that Hentif's travel companion was affiliated with Al Qaeda.

[41] To get to Kandahar, Hentif followed a route used by Al Qaeda recruits. Although this fact alone is not significant, as there is no evidence that people who were unaffiliated with Al Qaeda did not use this route, "the fact that [Hentif] followed a common al Qaeda route nonetheless makes it somewhat more likely that he was an al Qaeda recruit." *Uthman*, 637 F.3d at 405–06.

Court is skeptical that the operators of an Al Qaeda guesthouse would allow an innocent visitor to stay there for multiple nights.[42]

Finally, at the time of Hentif's capture [redacted] wore a Casio watch. This is also probative evidence. [redacted]

Further, the model of Hentif's Casio watch is one that has been used in bombings linked to Al Qaeda and other terrorist groups. Although Casio watches of this model are not unique, the fact that Hentif possessed one is further support for respondents' contention that Hentif was part of Al Qaeda or the Taliban. *Cf. Al-Adahi*, 613 F.3d at 1109 (noting that evidence that a detainee had a Casio watch on his person at the time of his capture was a "telling fact[]").

---

[42] Further undermining Hentif's claim that he did not know that the house was an Al Qaeda guesthouse is the fact that Hentif admits to having interacted with [redacted], the Al Qaeda leader of the guesthouse, seeking his assistance in locating [redacted] and then following his instructions to do so.

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

Taken together, this evidence shows that it is more likely than not that Hentif was part of Al Qaeda or the Taliban.[43] Consequently, the Court concludes that Hentif's detention is lawful pursuant to the AUMF.

## III. CONCLUSION

For the foregoing reasons, Hentif's petition for a writ of habeas corpus shall be denied. An appropriate order accompanies this memorandum opinion.

Henry H. Kennedy, Jr.
United States District Judge

August 1, 2011

---

[43] Hentif also argues that if the Court finds that he delivered medical supplies, he must be released from Guantanamo Bay because medical personnel are not detainable under the Geneva Conventions. *See* First Geneva Convention, art. 24 (providing that individuals "exclusively engaged in the administration of medical units and establishments" are not detainable). The Court disagrees. Although it is not clear that the Geneva Conventions apply to this proceeding, *see Al-Bihani*, 590 F.3d at 871–72, even assuming they do, Hentif does not meet the definition for non-detainable medical personnel under the Geneva Conventions because he did not *exclusively* serve in a medical capacity while in Afghanistan. At most, he delivered medical supplies for a time while he was in Kabul. Accordingly, he was not "permanently and exclusively engaged as a medic," as would be required to qualify as non-detainable medical personnel under the Geneva Conventions. *Cf. Warafi v. Obama*, 409 Fed. App'x 360, 361 (D.C. Cir. 2011). Article 25 of the Geneva Conventions, which applies to auxiliary medical personnel, bolsters this conclusion. Auxiliary medical personnel are protected by the Geneva Conventions only "if they are carrying out these [medical] duties at the time when they come into contact with the enemy or fall into his hands." *See* First Geneva Convention, art. 25. Although Hentif does not qualify as auxiliary personnel due to his lack of medical training, *see id.*, this Article confirms what common sense also dictates—that just because an individual delivers medical supplies for a period of time, he is not entitled to permanent immunity under the Geneva Conventions, especially when at the time of his capture he is not engaged in medical tasks. Hentif engaged in activities that made him functionally "part of" Al Qaeda or the Taliban prior to and following his delivery of medical supplies. Consequently, his detention is lawful.


~~SECRET~~

UNCLASSIFIED//FOR PUBLIC RELEASE

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **FADHEL HUSSEIN SALEH HENTIF,**<br>**Petitioner,**<br>**v.**<br>**BARACK H. OBAMA, et al.,**<br>**Respondents.** | **Civil Action 06-01766 (HHK)** |

**JUDGMENT**

Pursuant to Fed. R. Civ. P. 58 and for the reasons set forth in the accompanying memorandum opinion filed with the Court Security Office this same day, it is this 1st day of August 2011, hereby

**ORDERED** that the petition for a writ of habeas corpus of Fadhel Hussein Saleh Hentif (ISN 259) is **DENIED**.

Henry H. Kennedy, Jr.
United States District Judge